■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN MANFREDI, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County (Egitto, J.), rendered April 25, 1989, convicting him of conspiracy in the fourth degree, conspiracy in the fifth degree, grand larceny in the first degree, and bribe receiving in the second degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed, and the matter is remitted to the Supreme Court, Kings County, for further proceedings pursuant to CPL 460.50 (5).

The defendant, his codefendant Koopalethes, and numerous other coconspirators were inspectors and managerial employees of the New York City Board of Education's Bureau of Maintenance, earning salaries in the vicinity of $28,000 to $59,000 a year. The defendant and his codefendant worked in the Bronx/Manhattan office. The evidence at trial revealed that before 1977 an ad hoc system of bribery and extortion existed in awarding contracts to contractors who performed maintenance and construction work for the New York City school system. At a meeting in early 1977 at LaStella's Restaurant in Queens, a group of inspectors and managers from all five boroughs, including the defendant and the codefendant Koopalethes, formalized the bribery system. At this

and subsequent meetings, these officials structured a process by which they would coerce surreptitious payments from contractors by withholding or delaying the paperwork or approvals upon which the contractors' compensation depended. The conspirators would also see to it that contractors who were recalcitrant or uncooperative in making payment would receive no further contracts from the Board of Education. There was also testimony that contractors who refused to pay the bribes were forced out of business when the officials involved made sure that those contractors were not paid for work already performed. The officials agreed that a contractor was obliged to pay a 2% bribe on routine "bid" contracts, a 5 to 10% bribe for change orders on bid contracts, and a 10% bribe for emergency "oral" contracts, which due to the city's fiscal crisis were becoming more and more frequent during the period of the conspiracy from 1977 through 1986. Pursuant to the scheme, the illicit payments would be split among the descending hierarchy of participants in each borough office, with the area manager receiving 10%, the assistant area manager 10%, the general inspector 40%, and the inspector 40%. As a quid pro quo, contractors who paid would obtain timely approval of their payment vouchers, and prompt processing of their bills. The conspirators also steered emergency jobs, which they could control and which constituted most of the Board of Education's projects during the fiscal crisis, to "cooperative" contractors. Gary Novick was the only prosecution witness whose testimony the court permitted the jury to consider as directly implicating the defendant in the substantive crimes. Novick testified that he had paid the defendant bribes on some 7 to 9 occasions between 1980 and 1983, but that the conspirators eventually forced his company out of business.

The defendant contends that the trial court erred in refusing to submit for the jury's determination the issue of whether Novick was an accomplice-in-fact, so as to require corroboration of his testimony pursuant to CPL 60.22. We find no merit in this argument. Firstly, although the defendant asked the court in general terms to instruct the jury that it could find unspecified witnesses to be accomplices-in-fact, he did not request the court to so instruct the jury with regard to Novick. Accordingly, the issue is unpreserved for appellate review (see, CPL 470.05 [2]). In any event, nothing in the record, reasonably considered (see, CPL 60.22 [2]), supports the characterization of Novick as an accomplice. The defendant does not suggest that Novick was his accomplice in the extor-

tion scheme or conspiracy. To be considered as a bribery accomplice, Novick would have had to pay the sums demanded freely and voluntarily, without fear, duress, or coercion (cf., Penal Law § 200.05; *People v Court,* 52 AD2d 891, *affd* 43 NY2d 817). However, Novick consistently testified that until he began contracting with the Board of Education in 1979, he was unaware of the system of bribing Board inspectors and managers in order to get paid. When he first learned of the "system," Novick testified, he strongly resisted, but to no avail, because his invoices for completed work were routinely "lost" until he cooperated. A person who pays a coerced bribe is not guilty of criminal conduct and cannot be an accomplice of the bribe receiver *(see, People v Court, supra).* In addition, unlike the situation in *Court (supra),* where illegal gambling operators paid police officers to refrain from enforcing the law, Novick was forced to pay bribes to receive a lawful entitlement—timely payment for work satisfactorily completed *(see,* General Municipal Law § 106-b). Under these circumstances, the court was correct in not charging that the jury could find Novick to have been an accomplice-in-fact.

There is similarly no merit to the defendant's argument, raised for the first time on appeal, that the court should have charged that the jury could find pre-1977 and post-1977 conspiracies, or independent borough-wide conspiracies. There is no reasonable view of the evidence, even when it is regarded in the light most favorable to the defendant *(see, People v Butts,* 72 NY2d 746, 750), that would justify a multiple conspiracies charge. The court was therefore under no obligation to give it *(see, People v Watts,* 57 NY2d 299). No evidence whatever was adduced of a pre-1977 conspiracy. The whole purpose of the conspiracy devised at LaStella's Restaurant in 1977 was to create a city-wide network to enforce the conspirators' demands for payment, and to capitalize on the increased number of oral contracts during the fiscal crisis. Likewise unconvincing is the defendant's assertion that the People failed to establish beyond a reasonable doubt that he belonged to the conspiracy because he was not invited to the conspirators' monthly meetings, and because there was no evidence of his sharing illegal bribes with his fellows. However, there was considerable evidence that the defendant was disliked and distrusted by his companions, at least in part because he appropriated more than his allotted percentage of the payoffs, in contravention of the established conspiratorial schedule. Trust and loyalty are not elements of conspiracy, nor is there a requirement that each defendant be aware of every act

committed in its furtherance. That the defendant and his partners chose to bypass one another in certain transactions, or to deprive one another of their respective shares of illegal payoffs, does not alter the conclusion that all of their "activities were entirely consonant with and in furtherance of the original conspiracy in which the [defendant] was a participant" *(United States v Salazar,* 485 F2d 1272, 1276-1277, cert denied 415 US 985). It is sufficient that, as in the instant case, the People proved the nature of the agreement and the defendant's willing participation in it *(see, United States v Alessi,* 638 F2d 466, 472-473).

The People concede that the luncheon meeting at LaStella's Restaurant was not an overt act in furtherance of any unlawful agreement, since at the time of the luncheon no unlawful agreement was yet in existence, so that this seminal meeting was, if anything, an act formative of the agreement *(cf., People v Menache,* 98 AD2d 335). However, the defendant did not point out to the trial court that the meeting at LaStella's was not a qualified overt act *(see,* CPL 470.05 [2]). Accordingly, he has failed to preserve this issue for appellate review. In any event, to the extent that the trial court erred in charging that the luncheon meeting was a qualified overt act, the error was harmless *(see, People v Crimmins,* 36 NY2d 230). The People needed to prove only one qualified overt act beyond a reasonable doubt; and the act of a coconspirator may be attributed to the defendant to establish the offense of conspiracy *(see,* Penal Law § 105.20; *People v Leisner,* 73 NY2d 140; *cf., People v McGee,* 49 NY2d 48, *cert denied sub nom. Waters v New York,* 446 US 942). The jurors convicted the codefendant Koopalethes of extorting money from John Mateus in 1985 in furtherance of the conspiracy, so that it is clear that they found the commission of that qualified act beyond a reasonable doubt. It is therefore apparent that the jury did not rely solely upon a nonqualifying act in finding the "overt act" essential to establish the crime of conspiracy beyond a reasonable doubt *(cf., People v Leisner, supra,* at 146).

The defendant further contends that it was reversible error for the court to have permitted another contractor, John Mateus, to testify that he had paid the defendant a bribe before the earliest date of the crimes charged in the indictment. The defendant claims that prejudice created by admission of this uncharged crime was not offset by its probative value, and was exacerbated by the court's failure to give a limiting instruction. However, this evidence was properly

admitted to prove the defendant's "motive" in joining the conspiracy (see, People v Molineux, 168 NY 264).

The evidence revealed that at the time the conspiracy was developed, the defendant had recently been promoted to assistant area manager, a position which afforded him no contact with contractors, and no ability to approve or withhold their compensation. This inability, according to the prosecution's case, was the defendant's reason for joining the conspiracy. He could, in this manner, partake of the payoffs engineered and received by his coconspirators. Thereafter, when the defendant became area manager and again resumed control over contractors' paperwork and approvals, he became less faithful to his partners, and kept the proceeds himself. It was not error for the court, in admitting proof of a pre-1977 payoff to the defendant, to allow the prosecutor to show that the defendant, prior to the conspiracy, had supplemented his income by extortion, and that he joined the conspiracy when he was no longer in a position to continue to do so.

We further find that Kings County properly exercised jurisdiction over the instant prosecution. Most of the overt acts committed by the conspirators took place there, with the result that Kings County had jurisdiction over the conspiracy as a whole as well as over its component object crimes, including those of the defendant which were committed largely in the Bronx (see, CPL 20.40 [1] [b]; Penal Law § 105.25 [1]; People v Aversa, 156 AD2d 371).

The defendant's sentence was neither harsh nor excessive (see, People v Suitte, 90 AD2d 80).

We have examined the defendant's remaining contentions and find them to be either unpreserved for appellate review or without merit. Kooper, J. P., Harwood, Balletta and Rosenblatt, JJ., concur.